UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

JUDITH SVIENTY,

        Plaintiff,

v.                                       Case No. 4:04-CV-67

WHIRLPOOL CORPORATION,                  HON. GORDON J. QUIST

        Defendant.

_____/

## OPINION

Plaintiff, Judith Svienty ("Svienty"), has sued Defendant, Whirlpool Corporation ("Whirlpool"), alleging that Whirlpool violated the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601 to 2654. Now before the Court is Whirlpool's motion for summary judgment. For the reasons set forth below, the Court will grant the motion and dismiss Svienty's complaint with prejudice.

## I. Facts

Svienty was employed full-time by Whirlpool at its Benton Harbor, Michigan, division from April 1988 until December 12, 2003. Svienty was a computer operator, and her most recent position with Whirlpool was an analyst in Whirlpool's Problem and Change Management Office ("PACMO"). PACMO was responsible for monitoring and resolving computer, phone, and other business system problems at Whirlpool's facilities located in various countries throughout the world. In other words, PACMO provided Whirlpool's IT (information technology) support. Because of the importance of its function, PACMO was staffed 24 hours per day, 7 days per week, 365 days per

year. PACMO consisted of five employees, a supervisor, Daniel Knuth ("Knuth"), and four analysts, including Svienty. Svienty generally worked the first shift from 6:00 a.m. to 2:00 p.m. during the week and was on-call some weekends.

During her employment with Whirlpool, Svienty worked part-time at Walgreens in Stevensville, Michigan as a general clerk and in the photo department. Svienty began working at Walgreens in 1992 following a reorganization by Whirlpool which resulted in a pay cut to Svienty. Svienty usually worked at Walgreens in the evenings.

In April 2002, Svienty had gallbladder surgery. During the surgery, Svienty suffered complications, which resulted in neck pain and headaches and pain in her arm and hand. After Svienty was released to return to work, she began physical therapy to address these problems. Initially, Svienty needed to take only an hour or two at a time for the physical therapy sessions. Svienty eventually needed more time off for the sessions, and beginning in February 2003, Svienty missed two days of work per week (Tuesdays and Fridays). Whirlpool granted Svienty these days off with full pay and benefits. Svienty continued to miss two days of work per week through the summer of 2003.

In September 2003, Knuth met with Svienty and presented three options to her: (1) work full time and receive physical therapy on her time off; (2) take short-term disability (and not work); or (3) take FMLA leave (and not work). Knuth testified that he asked Svienty to either work full time or to not work because her absences were creating a staffing problem for PACMO. (Knuth Dep. at 16 (stating that "[w]ith any of those options we are now staffed," because if Svienty worked full-time PACMO would be fully staffed and, if Svienty took short-term disability and/or FMLA leave, Knuth could hire a contractor to fill in for Svienty).) Svienty chose to return to work full-time.

In the fall of 2003, three events occurred that precipitated an investigation by Whirlpool into Svienty's work for Walgreens and/or caused Whirlpool to terminate Svienty for putting her work for Walgreens ahead of her responsibilities at Whirlpool. First, on September 25, 2003, Svienty called Knuth at approximately 5:30 a.m. (one-half hour before her shift at Whirlpool was to begin) and told him that she was ill and would not be coming to work that day. A short time later, Svienty drove to Grand Rapids, Michigan to attend a meeting for Walgreens photo personnel. (Svienty Dep. at 30; Bradas Memorandum, Def.'s Br. Supp. Ex. 16.) Second, during the morning on October 14, 2003, Svienty complained to Knuth that she was not feeling well and wanted to leave work early. Svienty left approximately one hour before the end of her shift. Svienty apparently felt better later that day and went to work at Walgreens. Knuth saw Svienty working at Walgreens at approximately 7:00 p.m. that night. (Knuth Dep. at 24.) Finally, on Sunday, October 19, 2003, Knuth saw Svienty working at Walgreens. (Id. at 23.) A few days earlier, Svienty had given Knuth a doctor's note stating that Svienty would be off work from October 19, 2003, through November 20, 2003, to undergo a surgical procedure for neck pain. Knuth referred Svienty's request to the Benefits Department for approval of short-term disability. Whirlpool approved Svienty's request for leave on October 22, 2003, retroactive to October 19.

During the week of October 20, 2003, Knuth told Karl Milam ("Milam"), Whirlpool's Director of Human Resources for Information Systems, that he had seen Svienty working at Walgreens in the evening on October 19, 2003, even though the note from her doctor indicated that she was to be off work beginning that day.[1] Knuth also told Milam about the incident on October

---

[1] Svienty also worked for Whirlpool earlier in the day on October 19, but Knuth did not become aware of that fact until sometime later. (Knuth Dep. at 23-24.)

3

14, where Knuth saw Svienty working at Walgreens even though Svienty had left work early that day after complaining that she did not feel well.  Finally, Knuth told Milam that Svienty had missed work on September 15, 16, and 25, but had only provided a doctor's statement for September 15. (E-mail from Knuth to Milam of 10/22/03, Def.'s Br. Supp. Ex. 3.)  After receiving this information from Knuth, Milam called Svienty and asked her to come to his office for a meeting.

On October 24, 2003, Milam and Knuth met with Svienty to question her about whether she was, in fact, sick on the days she had taken off work or whether she had reported being sick for some other reason, such as to work for Walgreens.  At the beginning of the meeting, Milam told Svienty that he was going to ask her several questions and stressed that it was important that she tell the truth.  In particular, Milam asked Svienty whether she worked for another employer on October 14, 2003 (the day she left work at Whirlpool early), and whether she had worked for another employer on September 15, 16, or 25 while being off work at Whirlpool due to illness.  With regard to the first question, Svienty answered that she had worked for Walgreens on October 14 because she felt better later that day.  (Milam Dep. at 11; Svienty Dep. at 74.)  With regard to the second question, Svienty said that she had not worked for another employer on any of those three days.  (Milam Dep. at 12; Svienty Dep. at 74-75.)  At the conclusion of the meeting, Milam suspended Svienty without pay or benefits pending his further investigation, based upon Svienty's admission that she had worked for Walgreens on October 14 after leaving work early at Whirlpool.

Following the meeting, Milam obtained additional information regarding Svienty's absences, including documentation from Svienty's health care providers regarding her September and October absences and a memo from Knuth indicating that Svienty had 45 medically excused absences in 2003.  In addition, Milam obtained records of the hours Svienty worked for Walgreens during 2003, which indicated that Svienty had in fact worked for Walgreens on September 25, 2003. (Milam Dep.

4

at 40-42; Svienty Walgreens Time Records, Def.'s Br. Supp. Ex. 14.)   Moreover, Svienty's supervisor at Walgreens, David Bradas, provided a noted confirming that Svienty attended a meeting in Grand Rapids on September 25.[2]

Prior to the completion of the investigation, Milam transferred to a different human resources department at Whirlpool, and Dennis Taggart ("Taggart") replaced Milam and took over the investigation.   On December 5, 2003, Taggart met with Svienty to get Svienty's side of the story. During the meeting, Svienty admitted that she had driven to Grand Rapids for Walgreens business.[3] Following the meeting, Taggart conferred with Milam, Knuth, and William Chickering ("Chickering"), Whirlpool's Employee Relations Director.   Based upon those discussions, Taggart decided to terminate Svienty for gross misconduct, specifically, putting her job at Walgreens ahead of her job at Whirlpool and then lying about it during the investigation.   On December 12, 2003, Taggart informed Svienty by phone and by letter of the decision to terminate her employment.   In his letter, Taggart stated:

> The investigation of the facts surrounding your suspension confirms that you put your work at Walgreen's [sic] ahead of your obligations to your job at Whirlpool and in addition you misrepresented those facts during the investigation.

(Letter from Taggart to Svienty of 12/12/03, Def.'s Br. Supp. Ex. 17.)

In 2004, after Svienty's termination, Whirlpool eliminated PACMO and outsourced its functions to a contractor.   Whirlpool had considered eliminating PACMO for years, and Knuth had discussed with Svienty the possible elimination of her job prior to her request for medical leave.   All

_____

[2]Initially, Walgreens paid Svienty for eight hours of work for September 25.   On November 20, 2003, after Whirlpool suspended Svienty, Walgreens deducted Svienty's pay for that day based upon Svienty's representation that she had to leave the meeting because she was ill.   (Bradas Mem., Def.'s Br. Supp. Ex. 16.)

[3]Svienty apparently told Taggart that she drove to Grand Rapids to pick up some paperwork at a Walgreens store and returned home, where she remained for the rest of the day.   (Taggart Notes, Def.'s Br. Supp. Ex. 4.) However, David Bradas, Svienty's supervisor at Walgreens, stated in his memo that Svienty went to Grand Rapids to attend a meeting for Walgreens photo personnel.

PACMO employees (except Svienty, who had been terminated) received severance packages as a result of the elimination.

## II.  Summary Judgment Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56.  Material facts are facts which are defined by substantive law and are necessary to apply the law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).  A dispute is genuine if a reasonable jury could return judgment for the non-moving party.  Id.

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Agristor Financial Corp. v. Van Sickle, 967 F.2d 233, 236 (6th Cir. 1992) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)).

## III.  Discussion

The FMLA provides eligible employees with a maximum of twelve weeks of unpaid leave in a given twelve month period to attend to certain family and medical matters. 29 U.S.C. § 2612(a). Leave may be taken for specified reasons, including medical reasons, childbirth or adoption, or for the care of a spouse, parent, or child who suffers from a serious health condition.  Id.  Upon return from FMLA leave, an employer must restore an employee to his former job or another position with equivalent pay, benefits, and conditions of employment. 29 U.S.C. § 2614(a)(1).  In addition, the FMLA prohibits an employer from retaliating against an employee who exercises his rights under the FMLA. 29 U.S.C. § 2615(a)(2).  An employer who violates the FMLA is liable to the injured employee for compensatory damages, back pay, and equitable relief. 29 U.S.C. § 2617(a)(1).

6

The Sixth Circuit has noted that the FMLA provides two different types of claims or theories of liability. See Hoge v. Honda of Am. Mfg., Inc., 384 F.3d 238, 244 (6th Cir. 2004); Arban v. West Publ'g Corp., 345 F.3d 390, 400-01 (6th Cir. 2003). The first theory is the "entitlement" or "interference" theory, which is based upon the substantive rights created by the FMLA. See Arban, 345 F.3d at 401. An employer is liable under this theory if it interferes with an employee's FMLA-created right to medical leave or to reinstatement following the leave. See 29 U.S.C. § 2615(a)(1) ("It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this title."). To prevail on this type of claim, an employee need only show that she was denied an entitlement under the FMLA. See Hoge, 384 F.3d at 244. The employer's intent is irrelevant to such a claim. See id.; Smith v. Diffee Ford-Lincoln-Mercury, Inc., 298 F.3d 955, 960 (10th Cir. 2002). The "retaliation" or "discrimination" theory provides a separate basis for a FMLA claim. It arises under 29 U.S.C. § 2615(a)(2), which provides that "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this title." See also 29 C.F.R. § 825.220(c) (prohibiting employers from "us[ing] the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions").

In her complaint, Svienty alleges only what the Court interprets to be an entitlement claim, because she alleges that Whirlpool violated the FMLA by failing to restore her to her previous or an equivalent position with equivalent pay and benefits when she was scheduled to return from medical leave. In its brief in support of its motion for summary judgment, Whirlpool assumed that Svienty was making both an entitlement and a retaliation claim because the precise nature of her claim was unclear. But, in its reply brief, Whirlpool argues that Svienty's only claim is retaliation because she failed to present evidence or argument supporting an entitlement theory. Based upon its review of

7

Svienty's brief, the Court concludes that Svienty is making both entitlement and retaliation claims. (Pl.'s Resp. Br. at 2 ("It is Plaintiff's position that Defendant's Motion for Summary Judgment should be denied as she is entitled to recovery for violation of the FMLA under either the entitlement theory or the discrimination theory"), 14 (stating that Svienty "alleges that . . . Whirlpool, violated the FMLA by terminating Ms. Svienty while she was on medical leave and by failing to reinstate her at the completion of the leave").)   Therefore, the Court will address both types of claims, although it notes that both claims turn on the same issue: whether Whirlpool discharged Svienty for a legitimate nondiscriminatory reason unrelated to Svienty's exercise of her rights under the FMLA.

**A.    Entitlement Claim**

In order to establish an entitlement claim, a plaintiff must show that: (1) she was an eligible employee; (2) the defendant is a covered employer; (3) she was entitled to leave under the FMLA; (4) she gave the defendant notice of her intent to take leave; and (5) the defendant denied her FMLA benefits or interfered with FMLA rights to which she was entitled.  See Cavin v. Honda of Am. Mfg., Inc., 346 F.3d 713, 719 (6th Cir. 2003).  There is no dispute that Svienty has established the first four elements of the claim.  As to the fifth element, Svienty argues that Whirlpool interfered with her FMLA rights by terminating her while she was on FMLA leave and by failing to reinstate her.

The FMLA provides, and the courts have recognized, that an employee who requests or takes FMLA leave has no greater rights than an employee who remains at work.  As explained in Arban v. West Publishing Corp., 345 F.3d 390 (6th Cir. 2003):

> The substantive right to reinstatement provided in § 2614(a)(1), however, "shall [not] be construed to entitle any restored employee to . . . any right, benefit, or position of employment other than any right, benefit or position to which the employee would have been entitled had the employee not taken the leave." 29 U.S.C. § 2614(a)(3)(B).  Similarly, the right to non-interference with medical leave also is

not absolute. "[A]n employee who requests FMLA leave would have no greater protection against his or her employment being terminated for reasons not related to his or her FMLA request than he or she did before submitting that request." *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1262 (10th Cir. 1998). An employee lawfully may be dismissed, preventing him from exercising his statutory rights to FMLA leave or reinstatement, but only if the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave. *Id.*

345 F.3d at 401. See also Hoge, 384 F.3d at 245 ("An employee returning from FMLA leave is not entitled to restoration unless he would have continued to be employed if he had not taken FMLA leave."); O'Connor v. PCA Family Health Plan, Inc., 200 F.3d 1349, 1354 (11th Cir. 2000) ("We hold that when an 'eligible employee' who was on FMLA leave alleges her employer denied her FMLA right to reinstatement, the employer has an opportunity to demonstrate it would have discharged the employee even had she not been on FMLA leave.") Thus, an employer is not precluded from terminating an employee who has requested or taken FMLA leave, so long as the employee's exercise of FMLA rights is not a factor in the employer's decision to take action against the employee. See Pharakhone v. Nissan N. Am., Inc., 324 F.3d 405, 408 (6th Cir. 2003) ("If the employee cannot show that he was discharged because he took leave – or at least that his taking of leave was a 'negative factor' in the employer's decision to discharge him – he cannot show a violation of the FMLA."); Tuberville v. Personal Fin. Corp., No. 3:95CV150-B-A, 1996 WL 407571, at *3 (N.D. Miss. June 5, 1996) (stating that the FMLA does not prevent "an employer from terminating an employee who has taken leave under the Act").

In this case, Whirlpool has presented evidence that it terminated Svienty for dishonesty, specifically, when she told her supervisor on September 25 that she was too ill to work but then a short time later drove to Grand Rapids for Walgreens business and when she lied to Whirlpool when questioned by Milam during the October 24 meeting with Milam and Knuth. The evidence, which is not in dispute, shows that  Knuth became suspicious after he observed Svienty working at

9

Walgreens on October 19, when she was supposed to be on medical leave. Although Svienty also worked for Whirlpool earlier in the day, Knuth did not know this at the time, and he was justifiably concerned about whether Svienty's need for FMLA leave was legitimate. This is especially true in light of the fact that earlier that same week, Svienty left work early allegedly because she was sick but went to work for Walgreens later that day. Similarly, Milam had a reasonable basis for suspending Svienty following the October 24 meeting because Svienty's admission that she had worked at Walgreens on October 14 after leaving early from her job at Whirlpool raised concerns that Svienty may have missed work on other days in order to work at Walgreens. Further investigation proved that such was the case on September 25.

Svienty cites three grounds for concluding that her termination was based solely upon her FMLA leave. First, she contends that Knuth's attitude regarding Svienty's FMLA leave shows that he was unhappy about Svienty's medical leaves and sought to do something about it. In particular, Svienty cites Knuth's testimony that he was upset that Svienty requested medical leave in October 2003; Knuth's request to Svienty in September 2003 that she either work full time or take short-term disability or FMLA leave; Knuth's October 22, 2003, e-mail to Milam in which Knuth stated that he had disallowed Svienty's request to miss work two days each week while in therapy; and Knuth's December 9, 2003, letter to Whirlpool executives requesting authorization for Svienty's termination. None of this evidence supports an inference that Svienty's termination was based upon her FMLA leave rather than upon her lack of honesty with Whirlpool regarding the reason for her absence on September 25. For example, while it is true that Knuth testified that he was "upset" by Svienty's request for leave, he explained that he was upset because Svienty gave him no warning of her need for leave and he was going to be shorthanded in trying to staff PACMO. (Knuth Dep. at 37-38.)

10

Moreover, Knuth had previously *suggested* to Svienty that she take FMLA leave for physical therapy, which shows that he was not opposed to her taking medical leave.  Likewise, Knuth's October 22 e-mail to Milam fails to suggest that Knuth sought to interfere with Svienty's FMLA rights.  Knuth testified that he sent the e-mail to Milam at Milam's request after Knuth saw Svienty working at Walgreens.  In fact, Knuth devotes a substantial portion of his e-mail to the dates (October 14 and 19) on which he saw Svienty working at Walgreens and only mentions Svienty's medical leave in passing, primarily to make the point that Svienty had not provided a doctor's note for her absences on September 16 and 25.  Finally, Svienty inaccurately portrays Knuth's December 9, 2003, letter.  While it is true that Knuth stated, "Ms. Svienty has experienced a series of physical ailments that have prevented her from performing her duties at Whirlpool," Knuth went on to explain:

> Throughout this time, she has continued to engage in a second career with another employer.  It has recently come to our attention that she has placed this other career ahead of her primary obligations to Whirlpool.  Ms Svienty misrepresented her situation to her supervisor and to those investigating her status.

(Letter from Knuth to Sezer & Binkley of 12/9/03, Pl.'s Resp. Br. Ex. R.)  In short, none of this evidence tends to show that Whirlpool's reason for terminating Svienty was pretext or that Svienty's exercise of her FMLA rights played any part in Whirlpool's decision to terminate Svienty.

Svienty next contends that Whirlpool's failure to provide a further response to the Department of Labor ("DOL") regarding its investigation of Svienty's FMLA complaint is evidence that Svienty's request for FMLA leave played a part in Whirlpool's decision to terminate her.  Specifically, Svienty points out that in his November 14, 2003, letter in response to an inquiry from the DOL, Chickering said that Svienty was on suspension for suspected serious conduct and that he

(Chickering) would be willing to work with the DOL regarding Svienty's FMLA concerns once Whirlpool had concluded its investigation. Although Svienty argues that Chickering never provided any further response to the DOL, Chickering did in fact send a subsequent letter to the DOL in which he stated that Whirlpool had not imposed any discipline against Svienty "for her absences from work due to her unfortunate injury" and that "no 'occurrences' or other disciplinary notations have been made." (Letter from Chickering to Darling of 11/26/03, Def.'s Reply Br. Ex. A; Chickering Dep. at 6-7.) Chickering indicated that from his conversations with the DOL investigator, the investigator was satisfied with the result and was closing the file on Svienty's complaint. (Chickering Dep. at 6.) Thus, contrary to Svienty's representations, Whirlpool did respond to the DOL. Thus, Whirlpool's response to the DOL's investigation proves nothing.

Finally, Svienty argues that Whirlpool's decision to eliminate PACMO while Svienty was on FMLA leave supports her claim because by terminating Svienty, Whirlpool relieved itself of having to give Svienty a severance package. This argument makes no sense because there is no connection between Svienty's exercise of her FMLA rights and Whirlpool's decision to pay the PACMO employees a severance package. Svienty was an at-will employee, and there is no evidence that Whirlpool was contractually bound to provide severance packages to Svienty or any other employee. Thus, if Whirlpool wanted to avoid severance payments, it could have simply decided not to provide severance packages at all. Moreover, even if avoidance of providing a severance package to Svienty were a factor in Whirlpool's decision to terminate Svienty (and there is no evidence that it was), Svienty fails to explain why that fact shows pretext or otherwise supports the conclusion that Whirlpool violated the FMLA.

12

### B.      Retaliation Claim

The Sixth Circuit has held that the *McDonnell Douglas* burden-shifting framework is applicable to FMLA retaliation claims.  See Skrjanc v. Great Lakes Power Serv. Co., 272 F.3d 309, 315 (6th Cir. 2001).  Under the *McDonnell Douglas* framework, a plaintiff relying upon indirect evidence must first establish a prima facie case.  Id.  If the plaintiff establishes a prima facie case, a presumption of intentional discrimination arises, and the burden then shifts to the defendant to set forth "'a legitimate, nondiscriminatory reason' . . . for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507, 113 S. Ct. 2742, 2747 (1993) (emphasis in original) (citations omitted) (quoting Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254, 101 S. Ct. 1089, 1094 (1981)).  If the defendant meets its burden of production, the plaintiff must then prove by a preponderance of the evidence that the defendant's conduct was motivated by unlawful discrimination rather than by the reasons articulated by the defendant.  See Kocsis v. Multi-Care Management, Inc., 97 F.3d 876, 883 (6th Cir. 1996)(citing Burdine, 450 U.S. at 252-53, 101 S. Ct. at 1093-94).  Notwithstanding the burden-shifting approach, the plaintiff retains the burden of persuasion at all times.  Barnhart v. Pickrel, Schaeffer & Ebeling Co., 12 F.3d 1382, 1390 (6th Cir. 1993) (per curiam).  In order to establish a prima facie case of retaliation, a plaintiff must show: "(1) he availed himself of a protected right under the FMLA . . . , (2) he was adversely affected by an employment decision . . . , and (3) . . . a causal connection between his exercise of a right under the FMLA and the adverse employment decision."  Skrjanc, 272 F.3d at 314.

Whirlpool argues that Svienty's claim fails because she cannot establish the third prong of a prima facie case of retaliation – a causal connection.  Citing Little v. BP Exploration & Oil Co.,

265 F.3d 357 (6th Cir. 2001), Whirlpool argues that the rule in the Sixth Circuit is that "'temporal proximity alone is insufficient to establish a causal connection for a retaliation claim.'" (Def.'s Br. Supp. at 14 (quoting Little, 265 F.3d at 363-64).)  Whirlpool further argues that the timing evidence in this case is especially weak because two months elapsed between the time Svienty informed Whirlpool that she was taking medical leave (approximately October 15) and her termination (December 13).  On the other hand, Svienty, citing DeBoer v. Masashi Auto Parts, Inc., No. 04-1067, 2005 WL 434526 (6th Cir. Feb. 25, 2005), argues that she has established a causal connection because she gave notice of her need for FMLA leave on October 15, 2003, and was suspended a short time later.  As discussed below, the Court finds it unnecessary to decide whether Svienty has established a prima facie case, because even assuming that she has done so, Svienty has failed to present any evidence showing that Whirlpool's reason for discharging Svienty – putting the interests of Walgreens ahead of Whirlpool and then lying about it – is pretext.[4]

---

[4]Whirlpool is correct that numerous Sixth Circuit cases have held that temporal proximity, alone, is insufficient to establish a causal connection.  See, e.g., Little, 265 F.3d at 363-64 (stating that "temporal proximity alone is insufficient to establish a causal connection for a retaliation claim" but noting that temporal proximity, in combination with other circumstances, may be sufficient to establish a causal connection); Nguyen v. City of Cleveland, 229 F.3d 559, 566 (6th Cir. 2000) (stating that "[i]n [Cooper v. City of North Olmsted, 795 F.2d 1265 (6th Cir. 1986)], we rejected the proposition that temporal proximity is enough, noting that the plaintiff had pointed to no additional evidence to support a finding that the protected activity and the adverse action were connected"); Johnson v. Univ. of Cincinnati, 215 F.3d 561, 582-83 (6th Cir. 2000) ("Although temporal proximity alone does not support an inference of retaliatory discrimination in the absence of other evidence, closeness in time between the filing with the EEOC and the adverse employment action is relevant and may evince the employer's intent."); McElroy v. Philips Med. Sys. N. Am., Inc., Nos. 03-6219, 03-6351, 2005 WL 406335, at * 10 (6th Cir. Feb. 18, 2005) (per curiam) ("Federal standards are clear that temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim."). On the other hand, several other Sixth Circuit cases have suggested that temporal proximity alone may be sufficient where the time between the protected activity and the adverse employment action is brief.  See, e.g., Nguyen, 229 F.3d at 567 (stating that "there may be circumstances where evidence of temporal proximity alone would be sufficient to support" a causal connection but holding that such circumstances were not present in that case); Moon v. Transp. Drivers, Inc., 836 F.2d 226, 229 (6th Cir. 1987) (stating that "proximity in time between protected activity and adverse employment action may give rise to an inference of causal connection," but also noting that "temporal proximity alone will not support an inference in the face of compelling evidence [to the contrary]").  Some cases have explicitly held that temporal proximity was sufficient to establish a causal connection.  For example, in DiCarlo v. Potter, 358 F.3d 408 (6th Cir. 2004), the Sixth Circuit reversed a district court's order granting summary judgment against the employee on his Title VIII retaliation claim where the proceedings to terminate him were initiated thirteen days after the employee filed a complaint with the Equal Employment Opportunity Commission against his supervisor.  Here, Svienty requested FMLA leave on or about October 15, and Whirlpool took an adverse employment action – suspending Svienty without pay, see White v. Burlington N. & Santa Fe Ry. Co., 364 F.3d 789, 801 (6th Cir. 2004) (en banc) – one week later on October 22.

14

As discussed above, Whirlpool has shown that it terminated Svienty for a legitimate, nondiscriminatory reason, namely, Svienty's calling in sick to attend a meeting at Walgreens and then lying about it during Whirlpool's investigation.  Therefore, Svienty must present evidence showing that Whirlpool's reason was a pretext for discrimination.  Svienty may establish that the proffered reason was a mere pretext by showing that 1) it had no basis in fact; 2) it was not the actual reason; or 3) it was insufficient to explain Whirlpool's decision to terminate Svienty.  See Johnson v. Univ. of Cincinnati, 215 F.3d 561, 573 (6th Cir. 2000).  Svienty essentially argues that Whirlpool's proffered reason was pretext because it was not the actual reason.  As support for this argument, Svienty cites: (1) Knuth's statements and actions; (2) Chickering's failure to respond to the DOL's investigation of Svienty's FMLA complaint; (3) Whirlpool's elimination of PACMO; (4) the timing of Whirlpool's investigation, suspension, and termination of Svienty in relation to her request for FMLA leave; (5) Whirlpool's suspension of Svienty for actions relating to October 14 and termination for a completely different incident on September 25, 2003[5]; and (6) Whirlpool's failure to use progressive discipline pursuant to its five-step progressive discipline policy.  The Court has already explained above why the first three situations fail to show that Whirlpool's true motivation for terminating Svienty was unlawful retaliation.  Therefore, it will limit its discussion to the last three circumstances.

With regard to Svienty's timing argument, while it is arguable that timing may suffice to establish a prima facie case, the Sixth Circuit has stated that "temporal proximity is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual."  Skrjanc, 272 F.3d at 317.  Moreover, as set forth above, nothing about the timing of Whirlpool's decisions to suspend and terminate Svienty is suspect in light of the

---

[5]Svienty incorrectly identifies the date as September 24, 2003, in her brief.

undisputed fact that Knuth saw Svienty working at Walgreens on October 19, when he believed that she was on medical leave, which prompted Whirlpool's investigation and eventual discovery of the September 25 incident – the basis for Whirlpool's decision to terminate Svienty.  For the same reason, the fact that Whirlpool suspended Svienty for the October 14 incident but terminated her for the September 25 incident fails to establish pretext.

Svienty also cannot establish pretext by citing Whirlpool's failure to apply progressive discipline pursuant to its written policy.  Contrary to Svienty's assertion, Whirlpool was not required to follow its progressive discipline policy before terminating Svienty for her actions relating to the September 25 incident.  As Svienty acknowledges, (Pl.'s Resp. Br. at 11), Whirlpool's policy expressly provides that it does not apply to situations involving gross misconduct:

> Gross misconduct involves serious situations of willful wrong doing such as fighting, theft, insubordination, falsification of company records, etc.  In such cases, the progressive discipline policy does not apply, and employees may be terminated without progressive discipline or probation.

(Whirlpool Progressive Discipline Policy, Pl.'s Resp. Br. Ex. T.)  Whirlpool determined that Svienty's conduct of calling in sick and working for Walgreens and then lying about it during the investigation constituted either theft (being paid by Whirlpool when she was working for another employer) or insubordination.  (Taggart Dep. at 36-37.)  There is nothing unreasonable about this determination, and, in spite of Svienty's insistence that an issue of fact remains with regard to whether Svienty's actions constituted gross misconduct as defined by Whirlpool's policy, Svienty fails to cite any evidence creating an issue of fact, other than the fact that Whirlpool does not have a policy defining gross misconduct.  However, even where an employer's decision is based solely upon subjective factors, a court's function is limited to determining whether the employer gave an honest explanation for its decision.  See Hedrick v. W. Reserve Care Sys., 355 F.3d 444, 462 (6th

Cir. 2004).  The Court determines that Whirlpool has provided a reasonable and honest explanation of why it determined that Svienty's actions constituted gross misconduct.  The fact that Svienty could have taken a vacation day on September 25 and worked for Walgreens without any repercussions at Whirlpool is irrelevant, because those are not the facts of this case.[6]

Accordingly,  Svienty's evidence of pretext fails, and Whirlpool is entitled to judgment as a matter of law.

### IV.  Conclusion

For the foregoing reasons, the Court will grant Whirlpool's motion for summary judgment. An Order consistent with this Opinion will be entered.


Dated:  July 7, 2005                                      _____/s/ Gordon J. Quist_____
                                                                        GORDON J. QUIST
                                                                        UNITED STATES DISTRICT JUDGE

---

[6]Svienty's reliance upon DeBoer v. Mushashi Auto Parts, Inc., No. 04-1067, 2005 WL 434526 (6th Cir. Feb. 25, 2005), for the proposition that Whirlpool was required to apply its progressive discipline policy is misplaced.  In DeBoer, the plaintiff was demoted because of her poor supervisory skills.  The court held that the employer's failure to follow its Associate Counseling Policy before demoting the plaintiff constituted evidence of pretext.   Id. at *5.  In contrast, here, Svienty was discharged for gross misconduct, not for poor work performance.